CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAY 04 2018

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| JAMES W., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:17-cv-00012 |
| v. | ) | |
| | ) | <u>REPORT & RECOMMENDATION</u> |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER | ) | By:   Joel C. Hoppe |
| OF SOCIAL SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff James W. ("Plaintiff"), appearing pro se, asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative record, the parties' arguments, and the applicable law, I cannot find that substantial evidence supports the Commissioner's final decision. Therefore, I recommend that the decision be reversed and the case be remanded under the fourth sentence of 42 U.S.C. § 405(g) to give the Commissioner another opportunity to explain her findings and conclusions.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of

proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

This is not Plaintiff's first attempt to obtain benefits. Plaintiff protectively filed

applications for SSI and disability insurance benefits ("DIB"), under Title II of the Act, 42

U.S.C. §§ 401–434, on February 16, 2010. Administrative Record ("R.") 122, ECF No. 9-1.

These claims were denied initially and upon reconsideration, after which time they were heard

by ALJ Marc Mates, who issued a written decision on September 20, 2011, denying Plaintiff's

applications. R. 122–31. Plaintiff appealed ALJ Mates's determination to the Appeals Council,

which denied his request for review on January 8, 2013. R. 136–39. He did not appeal that denial

to a federal district court, making ALJ Mates's opinion the final decision of the Commissioner

through September 20, 2011.

Plaintiff then filed the current SSI application on January 31, 2013, alleging disability as

of December 9, 2009, caused by a broken neck, nerve damage, dislocated shoulder, depression,

and scoliosis.[1] R. 33, 90–91, 221–27, 273. Plaintiff was born on November 30, 1964, making

him forty-eight years old when he filed this application. R. 90. Disability Determination Services

("DDS"), the state agency, denied his claim at the initial, R. 90–102, and reconsideration stages,

---

[1] Plaintiff also filed a DIB application, R. 237–38, but on March 3, 2013, he was informed that this application was denied because the last date he had enough credits to qualify for DIB was December 2009, R. 183–85. The record does not indicate that Plaintiff appealed this determination, and thus, as explained below, I consider only his SSI application.

R. 104–17. Plaintiff then requested an administrative hearing at which he appeared on March 3,

2015, with a non-attorney representative and testified before ALJ R. Neely Owen. *See* R. 33, 55–

87. A vocational expert ("VE") also testified as to the nature of Plaintiff's past work and his

ability to perform other jobs in the local and national economies. R. 80–86.

On May 28, 2015, ALJ Owen issued a written decision that was a partially favorable

determination of Plaintiff's SSI claim. R. 46 ("The claimant was not disabled prior to May 30,

2014, but became disabled on that date and has continued to be disabled through the date of this

decision."). He discussed the prior decision by ALJ Mates, noting in particular that it issued on

September 20, 2011, and Plaintiff did not appeal once that decision became the final decision of

the Commissioner. R. 33. ALJ Owen found no error on the face of that decision or other reason

to reopen it; thus, he applied res judicata principles to ALJ Mates's factual findings and

addressed Plaintiff's current SSI application from September 21, 2011, through the date of his

decision. *See* R. 33–34. The ALJ found that Plaintiff had not engaged in substantial gainful

activity during the relevant period. R. 36. The ALJ determined that Plaintiff had severe

impairments of "discogenic/degenerative back disorder and dysfunction of a major joint (knees)"

since December 9, 2009. *Id.* All other impairments, including adjustment disorder with depressed

mood, depression, alcohol dependence, hepatic steatosis, left shoulder impairment, mild bilateral

hip degeneration, mild osteopenia, and history of cervical spine fusion surgery and degenerative

disc changes at C6-7, were deemed non-severe because no evidence in the record indicated that

these conditions caused more than a minimal effect on Plaintiff's functioning for the requisite

twelve-month durational period. *Id.* ALJ Owen then concluded that none of Plaintiff's

impairments, alone or in combination, met or medically equaled the severity of a listed

impairment. R. 36–37. He specifically considered Listings 1.02(A) and 1.04. *Id.*

The ALJ next addressed Plaintiff's residual functional capacity ("RFC").[2] R. 21–25. ALJ Owen determined that prior to May 30, 2014, Plaintiff could perform light work[3] except that he could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but he could never climb ladders, ropes, or scaffolds. R. 37. ALJ Owen then found that beginning on May 30, 2014, Plaintiff had the RFC to perform sedentary work[4] with the same additional postural limitations. R. 44. Considering these RFCs, ALJ Owen found that Plaintiff could not perform any of his past relevant work. R. 44–45. Before May 30, 2014, however, Plaintiff could perform certain light jobs that existed in significant numbers in the Virginia and national economies, including office helper, order filler, and store clerk. R. 45–46. ALJ Owen determined that Plaintiff was disabled as of May 30, 2014, based on his sedentary RFC and his age, as there were no jobs that existed in significant numbers in the national economy that a claimant with Plaintiff's age, education, work experience, and RFC could perform per Medical Vocational Rule 201.14. R. 46. The Appeals Council denied Plaintiff's request for review of the ALJ's partially favorable decision, R. 1–4, and this appeal followed.

### III. Discussion

---

[2] A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. § 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[3] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a). A person who can meet these lifting requirements can perform a full range of sedentary work if he can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

Plaintiff primarily argues that ALJ Owen erred by not issuing a fully favorable decision, as he believes he has been disabled throughout the relevant period. Compl., ECF No. 2.[5] Plaintiff specifically points to the ALJ's failure to properly evaluate the opinion of his treating physician, Joseph Gjolaj, M.D., as error requiring remand. *Id.* at 8. Because ALJ Owen did not adequately explain his assessment of this medical opinion, I cannot find that substantial evidence supports his decision, and the case must be remanded for further consideration.

A.    Background

    1.    *Relevant Medical Evidence*

Plaintiff presented to the University of Virginia Health System ("UVA") on May 29, 2012, for an initial evaluation of his low back pain. R. 420. He was examined in UVA's Spine Center by Rebecca Lehman, P.A.-C, and reported that the pain radiated from his lower back through both legs. *Id.* Findings on physical examination were normal, with full strength and range of motion throughout, negative straight leg raising rest, and normal gait without the use of an assistive device. R. 422. From radiographs of the lumbar spine, P.A. Lehman assessed severe thoracolumbar sigmoid scoliosis, as well as degenerative disc disease and facet arthropathy at the lower lumbar spine. R. 423. P.A. Lehman ordered an MRI and explained to Plaintiff that initial treatment would be conservative, including injections and physical therapy. *Id.*

Plaintiff returned to UVA on June 27, and P.A. Lehman discussed the results of his diagnostic imaging. R. 419. The MRI revealed "multilevel degenerative change throughout the lumbar spine most severe at T12-L1 where there is moderate central stenosis"; mild-to-moderate central stenosis at L1-2 and L2-3; mild central stenosis at L3-4; "multilevel high-grade bilateral

---

[5] As the Commissioner acknowledges, Def.'s Br. 1 n.2, ECF No. 15, Plaintiff articulated the majority of his arguments in his complaint rather than in the brief he filed with the Court, *see* Pl.'s Br., ECF No. 13. Given Plaintiff's pro se status, I will consider the relevant arguments from both filings.

neuroforaminal narrowing"; "severe lower lumbar facet joint osteoarthritis"; a "small, nonspecific area of signal abnormality in the right hemisacrum"; and "redemonstrated convex rightward scoliosis of the thoracolumbar junction and convex leftward curvature of the lower lumbar spine." *Id.* P.A. Lehman recommended an epidural steroid injection ("ESI") "given his stenosis." *Id.*

On August 21, Plaintiff treated with Mark Miller, M.D., for bilateral knee pain. R. 415. A physical examination was normal, although Plaintiff had patella crepitus in both knees. R. 416–17. Dr. Miller administered steroid injections in both knees. R. 417. On September 19, Plaintiff reported to Elizabeth Pickeral, F.N.P., whom he saw regularly at PATHS Community Medical Center ("PATHS"), that he had been receiving knee and spine injections and that they had helped relieve his pain. R. 348–49.

Plaintiff followed up at UVA for his back and bilateral leg pain on November 6 and treated with Dr. Gjolaj. R. 413. He reported having received three injections, none of which provided relief for longer than a month. *Id.* On physical examination, Plaintiff's thoracic-lumbar spine was "notable for diminished flexion, extension, rotation, and lateral bending of his lumbar spine secondary to pain." R. 414. Lower extremity strength was 5/5 throughout, he could ambulate "with a normal reciprocating gait without use of assistive devices," and he could "step on his heels and on his toes without difficulty." *Id.* Dr. Gjolaj assessed lumbar stenosis with radiculopathy and scoliosis and discussed treatment options, including a decompression spinal fusion surgery for which Plaintiff would need to stop smoking. *Id.* Plaintiff returned to Dr. Gjolaj on December 18. R. 411. On physical examination, he displayed diminished range of motion secondary to pain in his thoracic and lumbar spine, ambulated with an antalgic gait, and had difficulty with repeated stepping on his heels and his toes. R. 412. Dr. Gjolaj assessed

"multilevel lumbar stenosis with radiculopathy as well as occasional myelopathy symptoms with degenerative scoliosis," and he noted that Plaintiff "failed maximal conservative treatment for his multilevel lumbar stenosis, causing primary radiculopathy symptoms, but also secondarily myelopathy symptoms including episodes of significant weakness in his lower extremities." *Id.* Dr. Gjolaj remarked that Plaintiff had "severe multilevel compressive disease, which poses a significant risk of neurological deterioration," and he explained that it was his belief that Plaintiff required extensive surgery as he "has had no significant lasting relief with any nonoperative treatment to date, and his back and leg pain continue to worsen." *Id.* Dr. Gjolaj further noted that he would "need a full-day of surgery to perform [the] procedure." R. 413.

Dr. Gjolaj and Francis Shen, M.D., performed the surgery on January 25, 2013. R. 398–401. The procedures included lumbar laminectomy at L2, L3, L4, L5, and S1; posterolateral arthrodesis and posterior segmental instrumentation from T10-S1; pelvic fixation with bilateral iliac screws; transforaminal lumbar interbody fusion at L5-S1; local autograft bone harvest from spinous processes and laminae L2-S1; and iliac crest autograft bone harvest. R. 399; *see also* R. 402–04. Dr. Shen noted that "due to the complexity of the case [two] spine surgeons were required" to perform these procedures. R. 404.

On February 1, Plaintiff presented to the emergency department at UVA with complaints of constipation and swelling in his legs and arms. R. 383. He was given medication and instructed to follow up with his primary care physician in one week. R. 386. Plaintiff followed up with Dr. Gjolaj for a postoperative evaluation on February 5 and reported that his pain had worsened since his visit to the emergency room. R. 407. Dr. Gjolaj observed Plaintiff "ambulating with the use of a walker" and that even with the walker, he still "ambulate[d] with an antalgic gait" and had significant back pain on ambulation. *Id.* X-rays showed apparent

improvement in Plaintiff's spinal alignment compared to preoperative imaging, and Dr. Gjolaj

did not see any evidence of hardware complications. *Id.* Dr. Gjolaj adjusted Plaintiff's pain

medication regimen to address problems that the physician believed were related to inadequate

pain control. R. 408.

Plaintiff next saw Dr. Gjolaj on April 2. R. 450. Plaintiff reported taking less pain

medication and experiencing "only occasional low back pain, which [was] controlled with

medication." *Id.* Plaintiff also stated that he could ambulate without assistance, although he did

wear a Jewett brace for immobilization whenever he was up and walking around. *Id.* On physical

examination, Dr. Gjolaj noted "intact sensation and motor strength of both lower extremities," no

abnormal reflexes, and normal ambulation with a walker. *Id.* X-rays obtained during this visit

showed no evidence of hardware complications and "slightly improved" spinal alignment from

the imaging obtained three weeks earlier. *Id.* Dr. Gjolaj decreased Plaintiff's pain medications,

which now included Percocet for severe pain only and Flexeril and lidocaine patches as needed.

R. 450–51. Dr. Gjolaj also recommended that Plaintiff continue with frequent ambulation and

use of the Jewett brace. R. 451. Plaintiff followed up with Dr. Gjolaj on July 1 and reported that

he had reduced his pain medication to "Percocet 5/325 4-6 times daily." R. 501. Plaintiff

continued to wear the Jewett brace while walking, and he reported no pain or cramping in his

legs, but he still experienced occasional back pain that could be controlled with medication. *Id.*

His physical examination remained unchanged from the previous visit. *See id.* Dr. Gjolaj again

adjusted Plaintiff's medications, substituting Norco for the Percocet, and advised him to continue

walking frequently for physical fitness and to abstain from smoking. R. 501–02. Imaging

revealed "postsurgical change from lumbar spine decompression and fusion from T10 to the

bilateral iliacs," but was otherwise unchanged from the previous X-rays. R. 505.

On September 20, Plaintiff visited Susan Miller, M.D., at UVA for a consultation regarding his low back pain "and assistance with return to work." R. 542. A review of systems was positive for back pain and numbness and weakness in the left lower extremity. R. 544. Plaintiff complained of "sharp pain running from [his] 'brain down to [his] leg.'" R. 549. A physical examination revealed decreased range of motion and tenderness in the right hip; normal left hip; decreased range of motion in the lumbar spine; normal strength; slow, stiff, abnormal gait; and 2+ patellar reflexes bilaterally, but 0 achilles reflexes bilaterally. R. 544. Dr. Miller continued Plaintiff on Lortab, added Neurontin, and remarked that she wanted to refer him to physical therapy, but acknowledged that Plaintiff "may not be able to" afford it "due to finances" and his lack of health insurance. R. 545. Plaintiff returned to Dr. Miller on October 8, at which time she administered a femoral acetabular joint injection to his right hip. R. 539–40. Plaintiff next saw Dr. Miller on December 16 and complained of left hip pain and continued back pain. R. 537–38. He reported wearing his back brace less frequently and that the Neurontin had helped his pain. *See* R. 537. Dr. Miller noted that imaging revealed mild bilateral hip degeneration. *Id.* On physical examination, Plaintiff had decreased range of motion in both hips, and he exhibited tenderness in his left lower lumbar spine. R. 538. Dr. Miller assessed bilateral hip impingement and noted that Plaintiff had experienced "good results of temporary pain reduction following [right] hip injection." *Id.* On December 31, Dr. Miller administered a left hip ESI injection. R. 535–36.

On January 2, 2014, Plaintiff visited Dr. Shen and reported that he was "doing quite well" although he recently had increasing left flank pain. R. 534. On physical examination, Plaintiff wore his Jewett brace and walked with a cane, but otherwise had good strength and intact sensation in the lower extremities. R. 535. Dr. Shen noted that "[p]lain radiographs showed good

placement" of the surgical hardware and that "[t]here is a rod fracture bilaterally at the lumbosacral junction, but he has acceptable alignment." *Id.* Dr. Shen explained that he was "pleased with how [Plaintiff was] doing overall" and that he would "try to continue [to] maximize conservative measures." *Id.* Dr. Shen further stated his belief that a CT myelogram would be a reasonable option "if [Plaintiff] had persistent or worsening symptoms." *Id.*

Plaintiff returned to Dr. Susan Miller for a follow up regarding his back pain and hip pain, as well as bilateral knee pain, on March 14. R. 531. Plaintiff used canes because of his knee pain, which led to an observation of abnormal gait, and he experienced occasional knee swelling. R. 531, 533. Plaintiff thought his right knee was contributing to his hip and low back problems. R. 531. A physical examination of the left knee was normal, and the right knee had tenderness, but was otherwise normal. R. 532. Imaging of the knees showed mild degenerative changes bilaterally, R. 558, and although Dr. Miller recommended physical therapy, Plaintiff had "ins[urance] or ability to pay for it." R. 533. Plaintiff followed up with Dr. Miller twice more for bilateral femoral acetabular joint injections. R. 528–29 (Apr. 7, 2014), 586–87 (Aug. 4, 2014).

The record also reveals that in July 2014, orders were entered for "FL myelogram lumbar" and "CT post myelo T spine." R. 574–75. The physician's orders note that the reason for these diagnostic procedures was back pain and "failed hardware." *Id.* By August 2014, it became clear that Plaintiff needed to undergo another surgery to address complications from his initial surgery in January 2013. *See* R. 572–75. There are limited treatment notes in the record regarding this second surgery, but Plaintiff testified that he had surgery to address the failed hardware in his back, R. 79, and ALJ Owen credited his testimony, R. 44.

   2.   *Opinion Evidence*

11

On April 2, 2013, Dr. Gjolaj completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" pertaining to Plaintiff's functional abilities. *See* R. 444–47. Dr. Gjolaj opined that Plaintiff could occasionally (and frequently) lift and/or carry less than ten pounds, could stand and/or walk for at least two hours during an eight-hour workday, and could not push and/or pull any weight greater than ten pounds with either his upper or lower extremities, but his sitting was not affected. R. 444–45. Dr. Gjolaj explained that these findings were supported by Plaintiff's "severe lumbar stenosis with scoliosis that required extensive reconstructive surgery" for which the "[t]ypical recovery period is up to 12 months." R. 445. Dr. Gjolaj also noted that Plaintiff had some postural limitations in that he could frequently balance and could occasionally kneel, crouch, and climb ramps, stairs, ladders, ropes, and scaffolds, but he could never crawl or stoop. *Id.* In supporting his conclusions, Dr. Gjolaj explained that Plaintiff's "spinal reconstruction limits his activity as indicated above." *Id.* Dr. Gjolaj further found that Plaintiff should have limited exposure to workplace hazards like machinery and heights because such conditions put Plaintiff "at excessively high risk of spinal injury such as paralysis." R. 446. Dr. Gjolaj did not impose any other limitations on Plaintiff's functioning. Last, in response to a prompt asking whether, in his "medical, clinical, and professional opinion," he felt that Plaintiff's "medically determinable impairment [was] 'severe' enough . . . [to] keep the claimant from doing any meaningful or gainful work at this time," Dr. Gjolaj answered in the affirmative and explained that Plaintiff's "spinal impairment and extensive reconstructive surgery limit him substantially from performing most physical tasks as detailed within this form." R. 447.

Next, DDS consultative reviewers conducted both an initial and reconsideration review of Plaintiff's application for benefits. *See* R. 90–102, 104–16. Robert McGuffin, M.D., conducted

the initial review on May 7, 2013. R. 91–94, 98–99. Dr. McGuffin opined that Plaintiff could lift

and/or carry twenty pounds occasionally and ten pounds frequently; could stand and/or walk for

about six hours and sit for about six hours during an eight-hour workday; and was unlimited in

his ability to push and/or pull, other than as shown for lift and carry. R. 98. Dr. McGuffin further

found that Plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and

stairs, but he could never climb ladders, ropes, or scaffolds. R. 98–99. Dr. McGuffin explained

that Plaintiff's back surgery from January 2013 contributed to his findings regarding both

Plaintiff's exertional and postural limitations, and he further explained that an April 2013

progress note from Plaintiff's three-month follow up appointment at UVA indicated that Plaintiff

was "doing well and showing healing and improvement." R. 99; *see* R.94, 97. Dr. McGuffin

assessed no other limitations. On reconsideration review in an opinion dated October 16, 2013,

R. 106–09, 112–14, Thomas Phillips, M.D., reaffirmed Dr. McGuffin's findings, and he

provided the same explanations for his conclusions, *see* R. 112–14.

### 3.    *Plaintiff's Submissions and Testimony*

On April 28, 2013, Plaintiff's non-attorney representative, Rev. Thomas W. Motley,

completed a function report on Plaintiff's behalf regarding his functional limitations. R. 262–69.

Plaintiff lived in a house with his mother and father, and on a typical day, he got out of bed when

the pain allowed, laid around the house after breakfast because the back pain made it hard to sit

or stand, could only walk when using a cane and a back brace, and was in constant pain when he

sat, stood, or tried to walk. R. 262. Plaintiff's pain woke him up at night, and he experienced

difficulty with personal care. R. 263. For example, his mother had to help him dress and undress,

and he could not bathe in a tub. *Id.* Plaintiff did not prepare his own meals or perform any house

or yard work. R. 264–65. He went outside only when he needed to go to the doctor's office or

pick up medications, and he did not drive "at this time" because of his medical condition. R. 265. Plaintiff did shop in stores for food, groceries, clothing, and other necessities, but he did so on a very limited basis. *Id.* Plaintiff did not go anywhere on a regular basis and struggled to keep his doctor's appointments. R. 266. Plaintiff experienced difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, concentrating, and using his hands. R. 267. He could walk for approximately twenty to thirty feet before needing to rest for approximately two to four minutes. *Id.* He became very distracted when he was in severe pain, and his medical conditions had started to cause stress. R. 267–68. Plaintiff also used crutches, a walker, a wheelchair, a cane, and a back brace/splint when he was standing, sitting, and walking. R. 268.

At the administrative hearing on March 3, 2015, Plaintiff testified about his functional limitations and explained that by the time his first back surgery was scheduled in January 2013, his spine was fifty degrees crooked and the "last eight discs in [his] lumbar [spine] were completely degenerated and gone." R. 69, 77. This condition required a twelve-hour reconstructive surgery which took place on January 25, 2013. R. 77. His conditions also affected his sleep, and he had not slept six hours in a night for at least three years. *Id.* Sitting, standing, or even lying down for long periods caused significant discomfort, and he got cramps in his hands, legs, and feet. R. 77–78. He had been walking with a cane for three years, and he could not feel his left leg. R. 78. His mother helped him cut his toenails, and his father sometimes helped him bathe. R. 78–79. By September 2014, all the hardware from the January 2013 surgery had failed, so he underwent another surgery to repair it. R. 79. Plaintiff further noted that there had been discussion of a potential third surgery. *Id.*

B.    *Analysis*

14

1.    *Treating Physician Opinion*

Plaintiff's most persuasive argument, and the one which requires remand, concerns ALJ Owen's evaluation of Dr. Gjolaj's medical opinion. The ALJ must weigh each "medical opinion" in the claimant's record. *See* 20 C.F.R. § 416.927(c). Medical opinions are statements from "acceptable medical sources" that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. *Id.* § 416.927(a)(1). The regulations classify medical opinions by their source: those from treating sources, and those from non-treating sources, such as examining physicians and state-agency medical reviewers. *See id.* § 416.927(c). A treating physician's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. § 416.927(c)(2). If the ALJ determines that the opinion is not entitled to controlling weight, then the ALJ must adequately explain the weight he afforded the opinion, taking into account all relevant factors, including the nature and extent of the physician's treatment relationship with the claimant; how well the physician explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the treating physician's opinion pertains to his or her area of specialty. 20 C.F.R. § 416.927(c); *see also Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013). Although treating physicians' medical opinions deserve deference, the ALJ may discount or reject such an opinion when there is "persuasive contrary evidence" in the record. *Mastro*, 270 F.3d at 178; *see Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam); *Hines*, 453 F.3d at 563 n.2.

ALJ Owen summarized Dr. Gjolaj's opinion and then assigned it "little weight." R. 43. The ALJ explained that this was because the opinion "was completed within 12 weeks of the claimant's spine surgery and it is not clear whether Dr. Gjolaj intended these restrictions to be temporary or permanent. In addition, the weight of the evidence of record as a whole does not support the extent of the limitations." *Id.* Conversely, ALJ Owen assigned the DDS experts' opinions "great weight" because "[t]heir conclusions of physical and mental functioning are found to be consistent with the medical evidence of record, including treatment notes and radiographic results." R. 44. Although ALJ Owen summarized and offered some analysis of the treatment notes in the record, R. 38–42, 43, he did not provide any further explanation for assessment of the medical opinion evidence.

Based on the record, I cannot find that substantial evidence supports ALJ Owen's evaluation of Dr. Gjolaj's opinion. First, without an adequate explanation, neither of the two reasons propounded by the ALJ is a good reason for discounting a treating physician's medical opinion. *See* 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."); *see also Woods v. Berryhill*, --- F.3d ---, 2018 WL 1954475, at *7 (4th Cir. Apr. 26, 2018) ("An ALJ must include a narrative discussion describing how the evidence supports his explanation of the varying degrees of weight he gave to differing opinions concerning the claimant's conditions and limitations." (internal quotation marks and brackets omitted)); *Kersey v. Astrue*, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009) (explaining that an ALJ may assign "little to no weight" to a treating physician's medical opinion based on the factors set out in 20 C.F.R. §§ 404.1527(c) and 416.927(c), if the ALJ "sufficiently explains his rational and if the record supports his findings.").

16

Second, the ALJ's consideration of Dr. Gjolaj's opinion must account for the nature of the treatment relationship. Dr. Gjolaj performed an extensive surgery on Plaintiff's spine, and he was able to observe his physical capacities before and after that surgery over a period of many months. Thus, Dr. Gjolaj possessed intimate knowledge of Plaintiff's back impairment and the functional limitations it caused. *See generally Woods*, 2018 WL 1954475, at *7 (noting that "[i]n general, an ALJ should accord 'more weight to medical opinions from a claimant's treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of a claimant's medical impairments.'" (quoting 20 C.F.R. § 404.1527(c)(2)) (brackets and parentheses omitted)).

Drawing from this foundation, Dr. Gjolaj assessed significant limitations in lifting, walking, standing, and performing postural activities, and he attributed those limitations to Plaintiff's "severe lumbar stenosis with scoliosis," R. 445, or his "spinal impairment" and "extensive reconstructive surgery," R. 447. Dr. Gjolaj noted that a "typical" recovery from surgery lasted up to twelve months, but he did not confine his individualized assessment of Plaintiff's limitations to this recovery period. Indeed, nothing in Dr. Gjolaj's opinion or any treatment note suggests that the extensive reconstruction of Plaintiff's spine was a temporary condition. Even so, the ALJ questioned whether Dr. Gjolaj's opinion addressed permanent or temporary limitations. The other cited basis for his opinion—severe lumbar stenosis with scoliosis—is a chronic condition. While the purpose of surgery undoubtedly was to improve that condition, the post-surgery treatment notes do not show a mitigation of Plaintiff's spine condition or restoration of functional capacity inconsistent with Dr. Gjolaj's assessment. Instead, those notes show an improved condition in April, June, and July 2013 that nonetheless still required Plaintiff to wear a Jewett back brace and ambulate with a walker or cane. He was able

to control his back pain with medications during these few months, but by September, his pain

was no longer confined to his back and had spread to his hip and lower extremity, causing

weakness and numbness. During the ensuing months, Plaintiff experienced some improvement in

pain from ESIs and his extremity numbness and weakness diminished, but those improvements

were short lived, and he continued to use a brace and cane when walking. He also experienced

increasing back, hip, and leg symptoms in late 2013 and early 2014, with significantly worsening

pain and loss of functioning by March 2014. *See* R. 531–33.Considering this record, it is difficult

to reconcile the ALJ's conclusion that "the weight of the evidence of record" did not support Dr.

Gjolaj's opinion.

Compounding this error, the ALJ did not specifically identify the evidence that he

determined to be in conflict with the limitations identified by Dr. Gjolaj. Accordingly, I must

conclude that the ALJ's reasons do not support his determination to afford Dr. Gjolaj's opinion

little weight. *Compare Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016) (finding that the ALJ

erred when he assigned a consultative examiner's opinion "limited weight" because "the

objective evidence or the claimant's treatment history did not support the consultative

examiner's findings" without identifying the objective evidence or treatment history), *with Sharp

v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016) (distinguishing *Monroe* and finding the ALJ's

analysis sufficient when he assigned a treating physician's opinion limited weight based on the

ALJ's determination that the claimant's "reported limitations were not supported by [that

physician's] office notes" because his explanation identified a specific category of evidence

enabling the court to conduct meaningful review).

Overall, ALJ Owen's evaluation of Dr. Gjolaj's opinion frustrates the Court's ability to

undertake meaningful review. *See Monroe*, 826 F.3d at 191 ("Without more specific explanation

of the ALJ's reasons for the differing weights he assigned various medical opinions, neither we

nor the district court can undertake meaningful substantial-evidence review."). Neither of the

ALJ's stated reasons for discounting Dr. Gjolaj's opinion "build an accurate and logical bridge

from the evidence to [the ALJ's] conclusion." *Id.* (quoting *Clifford v. Apfel*, 227 F.3d 863, 872

(7th Cir. 2000)). Without an adequate explanation as to why ALJ Owen assigned Dr. Gjolaj's

opinion little weight, I cannot find that substantial evidence supports his conclusion that Plaintiff

was not disabled prior to May 30, 2014. Therefore, this case must be remanded to permit the ALJ

to better articulate his evaluation of the medical opinion evidence, particularly Dr. Gjolaj's

opinion.

      2.    *Instructions on Remand*

     On remand, the ALJ need not address every argument raised by Plaintiff in this appeal, as

some of his contentions are without merit. First, Plaintiff's assertion that he is entitled to

disability insurance benefits as well as SSI is incorrect. Plaintiff claims his date last insured was

December 31, 2013, Compl. 7, but he presents no evidence in support of this position. As the

Commissioner accurately points out, Plaintiff submitted a DIB application, was denied for lack

of credits, and he did not appeal that determination. *See* Def.'s Br. 9–12. Because he did not

challenge this rejection of his DIB application at the agency level, as he was advised he had the

right to do, *see* R. 183–85, Plaintiff did not exhaust his administrative remedies. Thus, the

agency's decision became final under 42 U.S.C. § 405(g) as to his DIB application, which

deprives the Court of jurisdiction over this claim. *Majors v. Astrue*, No. 3:08cv5, 2008 WL

4144436, at *2 (W.D. Va. Sept. 5, 2008) ("The exhaustion of all available administrative

remedies is a prerequisite to federal court review under § 405(g)."). Moreover, the record is clear

that Plaintiff was last insured for DIB as of December 31, 2009, R. 124, and as such, he would

not qualify for DIB even if he had properly exhausted his remedies.

Plaintiff also contends that the Commissioner did not submit any evidence to bolster her

argument that substantial evidence supports ALJ Owen's opinion. Pl.'s Br. 2. This argument

misunderstands the applicable standard of review. As the claimant during the administrative

process, Plaintiff bore the burden of demonstrating his disability. *Hancock*, 667 F.3d at 472. As

the plaintiff on appeal to this Court, he also bears the burden of demonstrating that substantial

evidence does *not* support the ALJ's opinion. *See* W.D. Va. Gen. R. 4(c). Conversely, the

Commissioner has no obligation to show that substantial evidence supports the ALJ's opinion.

As such, I decline to compel the Commissioner to produce supporting evidence, and this

argument does not need to be addressed on remand.

What the ALJ must do on remand, however, is provide a coherent explanation for his

determination of Plaintiff's status prior to May 30, 2014. This includes, as explained above, an

appropriate evaluation of Dr. Gjolaj's treating source medical opinion. It also requires an

adequate discussion of why Plaintiff's RFC changed from light work to sedentary work on May

30, 2014. ALJ Owen noted that as of this date, "the claimant's allegations regarding his

symptoms and limitations are generally credible." R. 44. This finding is puzzling given that

Plaintiff's subjective complaints remained relatively consistent throughout the record, so it is

unclear why the ALJ did not find him credible for the relevant period prior to May 30, 2014, as

well. That said, credibility findings are inherently the prerogative of the ALJ, and on remand, it

is incumbent upon the ALJ to adequately articulate his reasoning as the Court will not speculate

to fill any gaps in the ALJ's explanation. With this in mind, the Commissioner should have

another opportunity to address Plaintiff's RFC prior to May 30, 2014, and determine whether he is entitled to SSI benefits for that period.

## IV. Conclusion

For the foregoing reasons, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 14, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 4, 2018

Joel C. Hoppe
United States Magistrate Judge